IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARIA SNYDER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     vs. | )   Civ. No. 16-00097 ACK-KJM |
| | ) |
| CACH, LLC, AND MANDARICH LAW | ) |
| GROUP, LLP, | ) |
| | ) |
|     Defendants. | ) |
| | ) |

**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS CLAIMS, DISMISSING DEFENDANTS' COUNTERCLAIM, AND DENYING PLAINTIFF'S MOTION TO DISMISS FOR LACK OF JURISDICTION DEFENDANTS' COUNTERCLAIM AS MOOT**

For the reasons set forth below, the Court GRANTS Defendants'[1] Motion to Compel Arbitration and Dismiss Claims, ECF No. 19, and DENIES Plaintiff's Motion to Dismiss for Lack of Jurisdiction Defendants' Counterclaim, ECF No. 21, as moot. The Court dismisses the Complaint as well as the Counterclaim, as both must be submitted to arbitration.

**FACTUAL BACKGROUND**

This action relates to Defendants and Counterclaimants CACH LLC's ("CACH") and Mandarich Law Group, LLP's ("Mandarich") (collectively, "Defendants") efforts to collect a credit card

---

[1] Although the Motion to Compel Arbitration and Dismiss Claims was titled and filed as CACH's Motion, Defendants' attorney clarified at the motions' hearing that the Motion to Compel Arbitration and Dismiss Claims was brought on behalf of both Defendants.

debt from Plaintiff and Counter-defendant Maria Snyder ("Snyder" or "Plaintiff").

## I.   Plaintiff's Allegations

Plaintiff alleges that she obtained a copy of her credit report dated June 23, 2015, which showed that Bank of America N.A. ("BANA") had been communicating information to the credit reporting agency related to her debt owed.  Compl. ¶¶ 14-15, ECF No. 1.  BANA reported that Plaintiff's account had been "charged-off with a 'Date of First Delinquency'" of April 2009.  Id. ¶ 15.  BANA reported that the balance of Plaintiff's account at the time of charge-off was $6,835.  Id. ¶ 16.

On May 2, 2015, Mandarich sent Plaintiff a letter informing her that her BANA account had been sold and assigned to Mandarich's client, CACH.  Id. ¶ 19.  The letter stated that Plaintiff had a current balance of $8,765.10 on a BANA account number ending in 5522.  Id. ¶ 17.

On or around June 16, 2015, Mandarich sent Plaintiff another letter attempting to collect the debt.  Id. ¶ 22.  The account summary page attached to the letter provided that the BANA account ending in 5522 was placed for collection with CACH on November 19, 2009 with an account balance of $6,835.10.  Id. ¶ 25.  Plaintiff alleges that Defendants did not have records of the underlying account, but that they "blindly assert[ed]" that the debt was owed by Plaintiff and that Defendants "illegally

add[ed] interest to the account." Id. ¶¶ 26-27. Plaintiff further alleges that the time period to collect the debt had expired at the time the collection letter was sent. Id. ¶ 33-34.

On or around February 24, 2016, Plaintiff called Mandarich to discuss her account. Id. ¶ 35. At this time, Mandarich informed her that she owed CACH $8,765.10 on her BANA account number ending in 5522. Id. ¶ 37.

Plaintiff claims that BANA charged off the alleged debt in October 2009 in the amount of $6,835 and that this was the amount of the debt when BANA sold it on November 19, 2009. Id. ¶ 41. Charge-off "means that the credit card receivable is no longer carried on a bank's books as an asset." Id. ¶ 40. Plaintiff maintains that BANA did not charge interest after the charge-off and that CACH was accordingly not "entitled to demand payment of any amount of interest they added to the account after [BANA] charged off the account." Id. ¶¶ 39, 43.

According to Plaintiff, BANA waived the right to add interest after charge-off and CACH acquired the debt subject to said waiver. Id. ¶ 51. Plaintiff also claims that Defendants "demand odd amounts from" her, noting that the balance stayed the same, at $6,835 between October 2009 and November 19, 2009 (with 0% interest); "mysteriously increases" to $8,765.10 between November 19, 2009 and May 2, 2015 (with an interest rate

3

of 4.665%); and then stays the same at $8,765.10 through February 24, 2016 (with 0% interest).  Id. ¶¶ 57-58.

## II.  Defendants' Allegations

Defendants claim that on or around October 24, 2003, Plaintiff opened an account with BANA to obtain an extension of credit.  Counterclaim ¶ 1, ECF No. 11.  On October 31, 2009, because of a lack of payment, BANA charged off the account with a balance owed of $6,835.10.  Id. ¶ 3.  On November 17, 2009, the account and underlying agreement were sold and transferred to CACH "with fully [sic] authority to do and perform all acts necessary for the collection, settlement, adjustment, compromise or satisfaction of the Account."  Id. ¶ 4.  According to Defendants, the account records provided to them demonstrate an applicable interest rate at the time of charge off of 10.24%. Id. ¶ 7.  Defendants allege that CACH is entitled to at least $8,765.10 pursuant to the account agreement.  Id. ¶¶ 19-20.

## III. Background Relevant to Motion to Compel Arbitration

In support of their Motion to Compel Arbitration, Defendants submitted a Declaration by Yekaterina Livits, custodian of records for CACH.  Livits Decl., ECF No. 19-4.[2]

---

[2]     CACH attached two Declarations by Yekaterina Livits to its Motion to Compel Arbitration: one pertaining to the instant case and one pertaining to Civ. No. 16-00174 HG-KSC.  Throughout this Order the Court refers only to the Declaration that applies to the instant case, i.e., ECF No. 19-4 (and attached exhibits).
(continued . . . )

Livits states that on or around October 24, 2003, Plaintiff opened a credit card account with BANA/FIA Card Services.[3]  Id. ¶ 7.  According to Livits, at the time Plaintiff opened the account, she also received a Bank of America Credit Card Account Agreement.  Id.

The "Cardholder Agreement," (the "Agreement") which according to Livits was sent to Plaintiff, id. ¶ 12, provides in relevant part as follows:

> **7.18: Governing Law.**  THIS AGREEMENT IS GOVERNED BY APPLICABLE ARIZONA AND FEDERAL LAW.
>
> **7.19: Arbitration.**  Any dispute, claim, or controversy ("Claim") by or between you and us (including each other's employees, agents or assigns) arising out of or relating to this Agreement, your Account, or the validity or scope of any provision of this Agreement including this arbitration clause shall, upon election by either you or us, be resolved by binding arbitration.
>
> . . . .
>
> This arbitration section of the Agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. §1-16.  Judgment upon arbitration may be

_____

( . . . continued)

[3]    FIA Card Services, N.A. ("FIA") was a wholly-owned subsidiary of Bank of America Corporation "and was created from a 2006 merger between Bank of America N.A. USA . . . and MBNA America N.A." See Comptroller of the Currency Administrator of National Banks, Public Disclosure, Evaluation Period: January 1, 2007-December 31, 2009, at 2, http://www.occ.gov/static/cra/craeval/oct10/22381.pdf.  FIA was merged with and into Bank of America, N.A. on October 1, 2014. Mot. to Compel Arbitration, Ex. A (Affidavit of Sale and Certification of Debt) ¶ 3, ECF No. 19-2.

> entered in any court having jurisdiction.
> Arbitration shall be conducted in the federal
> judicial district in which your billing address
> is located at the time the claim is filed.
>
> . . . .
>
> YOU UNDERSTAND AND AGREE THAT IF EITHER YOU OR WE
> ELECT TO ARBITRATE A CLAIM, THIS ARBITRATION
> SECTION PRECLUDES YOU AND US FROM HAVING A RIGHT
> OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH COURT,
> OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION
> FILED IN COURT BY OTHERS.  EXCEPT AS OTHERWISE
> PROVIDED ABOVE, ALL CLAIMS MUST BE RESOLVED
> THROUGH ARBITRATION IF YOU OR WE ELECT TO
> ARBITRATE.

Id., Ex. 2 §§ 7.18-7.19.

On or around November 12, 2009, BANA/FIA assigned Plaintiff's debt to CACH to collect the outstanding debt of $6,835.10.  Id. ¶ 8.  CACH entered into a written Loan Sale Agreement wherein it purchased "all rights, title and interest" in several credit card accounts, including Plaintiff's credit card account number ending in "5522."  Id. ¶ 9.  CACH also received information and records pertaining to Plaintiff's account that were "incorporated into the business records of CACH" and that were "relied upon by CACH in the ordinary course of business."  Id. ¶ 10.

### PROCEDURAL BACKGROUND

On March 7, 2016, Plaintiff filed the instant lawsuit seeking declaratory and injunctive relief, as well as actual and statutory damages for Defendants' alleged violations of the Fair

6

Debt Collection Practices Act ("FDCPA"), Hawaii Revised Statutes ("HRS") Sections 443B-18, 19, and 20 (regulating collection agencies) and Hawaii's Unfair or Deceptive Acts or Practices law, HRS Chapter 480.  Compl. ¶¶ 62-133.  Plaintiff alleges that Defendants made false, misleading, and deceptive representations in connection to the interest rate used and the amount owed; and that Defendants employed unfair practices in attempting to collect the debt.  Id.

On April 22, 2016, Defendants filed a Counterclaim seeking to collect the underlying debt from Plaintiff. Counterclaim ¶¶ 1-4, 19-20.

On May 5, 2016, Defendants filed a Motion to Consolidate the instant action with Snyder v. CACH, LLC et al., Civ. No. 16-00174 HG-KSC.  ECF No. 18.  On June 29, 2016, Magistrate Judge Kenneth Mansfield denied the Motion to Consolidate.  ECF No. 29.

On May 6, 2016, Defendants filed a Motion to Compel Arbitration and Dismiss Claims ("Motion to Compel Arbitration"). On May 13, 2016, Plaintiff filed a Motion to Dismiss for Lack of Jurisdiction Defendant's Counterclaim ("Motion to Dismiss the Counterclaim").[4]  Defendants filed their Opposition to

_____

[4]    On July 27, 2016, Defendants filed a Motion to Stay Discovery pending the Court's ruling on the Motion to Compel Arbitration.  ECF No. 31.  On September 8, 2016, Magistrate
(continued . . . )

Plaintiff's Motion to Dismiss the Counterclaim on September 9, 2016.  ECF No. 38.  Plaintiff filed her Opposition to Defendants' Motion to Compel Arbitration on September 12, 2016.  ECF No. 39.  Plaintiff filed her Reply on September 16, 2016 and Defendants filed their Reply on September 19, 2016.  ECF Nos. 40, 41.

The Court held a hearing on Defendants' Motion to Compel Arbitration and Plaintiff's Motion to Dismiss the Counterclaim on October 25, 2016 at 11:00 a.m.[5]

## STANDARD

### I.   Motion to Compel Arbitration

As provided in the Federal Arbitration Act ("FAA"), written arbitration agreements "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of any contract."  9 U.S.C. § 2.  "The FAA embodies a clear federal policy in favor of arbitration" and "[a]ny doubts concerning the scope of arbitrable issues should

---

( . . . continued)
Judge Mansfield denied the motion with respect to a handful of Plaintiff's discovery requests relevant to the Motion to Compel Arbitration, but granted the motion in all other respects.  ECF No. 37.

[5]   The Court scheduled the hearing on the Motion to Compel Arbitration and the Motion to Dismiss the Counterclaim following the disposition of Defendants' Motion to Consolidate. ECF No. 23.

be resolved in favor of arbitration." Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 719 (9th Cir. 1999) (citation omitted).  As noted by the Ninth Circuit, "[t]he standard for demonstrating arbitrability is not high" and arbitration agreements "are to be rigorously enforced." Id.

In deciding whether to compel arbitration, the court may not review the merits of the dispute.  Rather, "the court must determine '(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" Lowden v. T-Mobile USA, Inc., 512 F.3d 1213, 1217 (9th Cir. 2008) (quoting Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000)). The Court should also consider whether there exists "a defense that would be available to a party seeking to avoid the enforcement of any contract." Brown v. Dillard's, Inc., 430 F.3d 1004, 1010 (9th Cir. 2005); see also Williams v. 24 Hour Fitness, USA, Inc., No. CIV. 14-00560 DKW, 2015 WL 4139227, at *3 (D. Haw. July 8, 2015) (same).

On a motion to compel arbitration, the court "may properly consider documents outside of the pleadings." Xinhua Holdings Ltd. v. Elec. Recyclers Int'l, Inc., No. 1:13-CV-1409 AWI SKO, 2013 WL 6844270, at *5 (E.D. Cal. Dec. 26, 2013), aff'd sub nom. Clean Tech Partners, LLC v. Elec. Recyclers Int'l, Inc., 627 F. App'x 621 (9th Cir. 2015).

## II.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1), a party may move to dismiss based on a lack of subject matter jurisdiction.  "[T]he party asserting subject matter jurisdiction has the burden of proving its existence."  Robinson v. United States, 586 F.3d 683, 685 (9th Cir. 2009) (citation omitted).  Pursuant to Rule 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

### DISCUSSION

## I.  Defendants' Motion to Compel Arbitration and Dismiss Claims[6]

---

[6] The Court notes that the parties do not argue in their briefing that the question of arbitrability should be decided by the arbitrator.  The Ninth Circuit has noted that "gateway issues of arbitrability presumptively are reserved for the court."  Momot v. Mastro, 652 F.3d 982, 987 (9th Cir. 2011). However, "the parties may agree to delegate [issues of arbitrability] to the arbitrator."  Id.  In Momot, the court stated:

> Rather than applying "ordinary state-law principles that govern the formation of contracts" as we would when determining, for example, the scope of a concededly binding contract, the Supreme Court has cautioned that '[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so.'"

Id. (alteration in original) (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 939 (1995)).
Thus, the Ninth Circuit held that "the question of arbitrability is left to the court unless the parties **clearly and unmistakably** provide otherwise."  Id. at 988 (emphasis
(continued . . . )

( . . . continued)
added); cf. Hawaii State Teachers Ass'n v. Univ. Lab. Sch., 322 P.3d 966, 971 (Haw. 2014) (noting arbitrability is decided by the courts except if the parties "'clearly and unmistakably' reserved the issue of arbitrability for the arbitrator"). "Such '[c]lear and unmistakable 'evidence' of agreement to arbitrate arbitrability might include . . . a course of conduct demonstrating assent . . . or . . . an express agreement to do so.'" Id. (alterations in original) (quoting Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 79-80 (2010)).

The parties have not engaged in conduct demonstrating their assent to have the threshold question of arbitrability decided by the arbitrator. With respect to the terms of the Agreement, the Agreement provides that

> Any dispute, claim, or controversy ("Claim") by or between you and us (including each other's employees, agents or assigns) arising out of or relating to this Agreement, your Account, or the **validity or scope of any provision of this Agreement including this arbitration clause shall, upon election by either you or us, be resolved by binding arbitration**.

Livits Decl., Ex. 2 § 7.18 (emphasis added).

While the Agreement includes the possibility that the "validity or scope" of the arbitration clause may be subject to arbitration, it also notes that claims are arbitrable "upon election by either you or us." Id. Neither party has elected that the issue of arbitrability, i.e., the "validity or scope" of the arbitration clause, be subject to arbitration. Defendants seek to arbitrate the claims raised in Plaintiff's Complaint and in their Counterclaim, but have not asked that the arbitrator decide whether the claims are arbitrable. Neither has Plaintiff elected to arbitrate the issue of arbitrability. The Court notes that Defendants on page 11 of their Memorandum in Support of the Motion to Compel Arbitration state that the "Agreement specifically provides that arbitration may be invoked by either 'you or us.'" However, the Court determines that this language does not constitute clear and unmistakable evidence of an agreement to have the issue of arbitrability determined by the arbitrator rather than by the Court. Accordingly, there appears to be no clear and unmistakable agreement to arbitrate
(continued . . . )

The Court notes at the outset that Defendants' Motion to Compel Arbitration applies to two different credit card accounts, while only one account is relevant to the instant case.  As acknowledged by Defendants in their Reply, the Motion to Compel Arbitration was drafted to encompass the claims under both the instant case and Civ. No. 16-00174 HG-KSC.  Defendants' Reply, at 2, ECF No. 41.  However, as the two cases were not consolidated, the account described as "Account 1" in Defendants' Motion, i.e., Plaintiff's account number ending in 5522, is the only account relevant to this case and the motions at issue.  Id. at 2, 9; see also Livits Decl. ¶ 9 (referring to account number ending in 5522); Compl. ¶¶ 17, 23, 25, 37 (same).

As set forth below, the Court finds that a valid arbitration agreement exists and that the agreement encompasses the dispute at issue.  See Lowden, 512 F.3d at 1217.  The Court additionally concludes that Plaintiff has failed to raise a meritorious defense to arbitration.  Accordingly, the Court directs the parties to proceed to arbitration.[7]

---

( . . . continued)
the issue of arbitrability, and the Court thus decides the issue.

[7] Because the Court grants Defendants' Motion to Compel Arbitration, it rejects Plaintiff's requests for costs.  See Pl.'s Resp. in Opp'n to Defendants' Mot. to Compel Arbitration ("Pl.'s Opp'n"), at 2, ECF No. 39.

**A. The Livits Declaration and Exhibits**

Prior to analyzing the validity of the arbitration agreement, the Court considers Plaintiff's contention that the Livits Declaration contains "hearsay statements" because Livits "has no personal knowledge of the formation of the agreement or what terms were included therein." Pl.'s Opp'n, at 12. The Court rejects Plaintiff's argument and agrees with Defendants that the Declaration and the attached exhibits are admissible pursuant to the business records exception to the Federal Rules of Evidence ("FRE"). CACH Reply, at 10-11.

In Davis v. CACH, LLC, the Northern District of California, in dealing with a similar Declaration (where CACH was also a defendant), noted as follows:

> In [the Ninth] circuit, records that a business "receives from others are admissible under Federal Rule of Evidence 803(6)" when three conditions are met: (1) the records are kept by the recipient in the regular course of business, (2) are relied upon by the recipient business, and (3) the recipient business has a substantial interest in the accuracy of the records. See, e.g., MRT Const., Inc. v. Hardrives, Inc., 158 F.3d 478, 483 (9th Cir. 1998) (citing United States v. Childs, 5 F.3d 1328, 1333-34 n.3 (9th Cir. 1993)).

No. 14-CV-03892-BLF, 2015 WL 913392, at *4 (N.D. Cal. Mar. 2, 2015), reconsideration denied, No. 14-CV-03892-BLF, 2015 WL 2251044 (N.D. Cal. May 13, 2015). The court found the Declaration and the associated card member agreement admissible

13

because "CACH testifie[d] [through the declaration] that it received the Cardmember Agreement directly from Capital One, maintains the agreement in its files, and relies upon the Agreement in conducting its business of collecting debts." Id. at *5.

Here, the Livits Declaration provides that Livits is the custodian of records for CACH and that the Declaration is based on her personal knowledge as the custodian of records as well as a review of CACH business records "maintained in the regular course and scope of business." Livits Decl. ¶¶ 1, 5. Livits states that CACH purchased "a pool of account[s]" from BANA/FIA, including Plaintiff's account and that the records associated with the account were transferred to CACH, incorporated into CACH's business records, and "relied upon by CACH in the ordinary course of business." Id. ¶¶ 9-10. Livits further provides that CACH received from BANA/FIA "following a specific request," the relevant Credit Card Agreement attached as Exhibit 2 to her Declaration. Id. ¶ 12. It is clear that CACH has a substantial interest in the accuracy of the records received from BANA/FIA, given that it relies on these records in its function as a debt collector. Accordingly, the Court concludes that the exhibits attached to the Declaration are admissible under FRE 803(6). Moreover, Plaintiff has failed to demonstrate that Livits does not have personal knowledge of the

14

relevant issues pursuant to her role as custodian of records. As such, the Court finds the Declaration admissible.

## B. Whether a Valid Arbitration Agreement Exists

### i.  Choice-of-Law

Courts "apply state-law principles that govern the formation of contracts to determine whether a valid arbitration agreement exists." Lowden, 512 F.3d at 1217.  The parties appear to dispute which state's law should apply, although they do not engage in a choice-of-law analysis.  Defendants argue that because the Agreement states that it is governed by Arizona and Federal law, the Court should apply Arizona law to determine whether the arbitration clause is valid.  Mem. in Support of Motion to Compel Arbitration, at 6, ECF No. 19-1; see also Livits Decl., Ex. 2 § 7.18.  Plaintiff cites to Hawaii law in her Opposition and maintains that she is "not seeking to have . . . Arizona . . . law applied to the matter of whether her alleged BOA account is subject to arbitration."  Pl.'s Opp'n, at 3.

While in diversity cases, the choice-of-law rules of the forum state apply, where jurisdiction is based on a federal question, federal common law applies to the choice-of-law determination.  See Huynh v. Chase Manhattan Bank, 465 F.3d 992, 997 (9th Cir. 2006) (noting federal common law choice-of law rules apply where jurisdiction is not based on diversity of

citizenship); Schoenberg v. Exportadora de Sal, S.A. de C.V., 930 F.2d 777, 782 (9th Cir. 1991) (same).  The Complaint alleges that jurisdiction is pursuant to the FDCPA, 15 U.S.C. § 1692 et seq.  Compl. ¶¶ 1-2.

The Ninth Circuit has also held that "where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state."  Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1164 (9th Cir. 1996).  The Complaint also includes state law claims and asserts supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Compl. ¶ 1.

Federal common law follows the Restatement (Second) of Conflict of Laws.  Huynh, 465 F.3d at 997.  Hawaii, the forum state, also follows the Restatement to determine which state's law applies where there exists a contractual choice-of-law provision.  See Standard Register Co. v. Keala, No. CIV. 14-00291 JMS-RLP, 2015 WL 3604265, at *6 (D. Haw. June 8, 2015). Thus, applying either federal common law or Hawaii law choice-of-law rules requires the Court to consider the Restatement.

The Restatement provides as follows

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an

16

explicit provision in their agreement directed to that issue,[8] unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2) (1971).

Here, it appears that subsection (a) applies, as Arizona does not seem to have any substantial relationship to the parties or the transaction.  Id. § 187(2)(a).  According to the Complaint and Answer, Defendant CACH is organized in Colorado and Defendant Mandarich is organized in California. Compl. ¶¶ 5-6; Answer ¶¶ 5-6, ECF No. 11.  Plaintiff resides in Honolulu County, Hawaii.  Compl. ¶ 4.  Plaintiff's Declaration

---

[8] Pursuant to the Restatement, "The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."  Restatement (Second) of Conflict of Laws § 187(1) (1971).  The commentary to the Restatement provides that "examples of . . . questions" that cannot be determined by a provision in the agreement include "those involving capacity, formalities and substantial validity."  Id. cmt. d.  Here, since the validity of the agreement is at issue, the Court considers § 187(2) of the Restatement in its choice-of-law analysis.

provides that she has never lived in Arizona and has never signed a contract in Arizona.   Snyder Decl. ¶ 3.   Moreover, CACH has provided "no other reasonable basis for the parties' choice" of Arizona law.   See Restatement (Second) of Conflict of Laws § 187(2)(a).   Indeed, during the hearing on the motions, Defendants' counsel informed the Court that he did not know why Arizona law was referenced in the Agreement.

Pursuant to the Restatement, "[i]n the absence of an effective choice of law by the parties, the law to be applied is that of the state with 'the most significant relationship to the transaction and the parties.'"   Energy Oils, Inc. v. Montana Power Co., 626 F.2d 731, 734 n.6 (9th Cir. 1980) (quoting Restatement (Second) of Conflict of Laws § 188[9]); cf. Standard Register, 2015 WL 3604265, at *6 ("Under Hawaii law, courts

---

[9]   The Restatement provides that the factors to consider include:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 188(2).

'look[ ] to the state with the most significant relationship to the parties and subject matter' in a choice-of-law analysis.'" (alteration in original) (quoting <u>Mikelson v. United Servs. Auto. Ass'n</u>, 111 P.3d 601, 607 (Haw. 2005))).

Here, the Court finds that Hawaii has the most significant relationship to the transaction and the parties.  As noted above, Defendants are organized in different states and the parties do not request that the Court apply the substantive law of these respective states (i.e., Colorado and California). On the other hand, Plaintiff cites to Hawaii law in her Opposition to the Motion to Compel Arbitration and Plaintiff is a resident of Hawaii.  There is no indication in the record that Plaintiff resided in a different state at the time she received the credit card agreement at issue.  Further, the letters sent to Plaintiff from Defendant Mandarich regarding the debt collection were sent to Plaintiff's Hawaii address.  <u>See</u> Compl., Exs. 2, 3, ECF Nos. 1-2, 1-3.  There is also no evidence before the court that Plaintiff or Defendants have any contacts with Arizona.

Accordingly, notwithstanding the reference to Arizona law in the Agreement, the Court applies Hawaii law to determine the validity of the Agreement.  <u>See</u> <u>Standard Register</u>, 2015 WL 3604265, at * 7 (applying Hawaii choice-of-law rules and determining Hawaii law applied despite contract's choice-of-law

19

provision where Hawaii had most significant relationship to the case).

ii.  <u>Validity of the Arbitration Agreement Under Hawaii Law</u>

Under Hawaii law, a valid arbitration agreement "must have the following three elements: (1) it must be in writing; (2) it must be unambiguous as to the intent to submit disputes or controversies to arbitration; and (3) there must be bilateral consideration." <u>Douglass v. Pflueger Hawaii, Inc.</u>, 135 P.3d 129, 140 (Haw. 2006); <u>see also</u> <u>Williams</u>, 2015 WL 4139227, at *4. The Court considers these elements in turn and finds each element has been satisfied.

1. *Existence of a Writing*

Plaintiff argues that the Agreement provided to the Court by Defendants does not govern the account at issue, claiming that the only agreement with Plaintiff's name on it "has a copyright date of 2005" while Defendants assert that her account was opened in 2003.  Pl.'s Opp'n, at 9-10.  However, the agreement containing the 2005 copyright date referenced by Plaintiff pertains to "Account 2" discussed in Defendants' Motion, which is not relevant to the instant case.

The 2003 Agreement pertaining to the account at issue here is attached to the Livits Declaration as Exhibit 2. Livits' Declaration provides that Plaintiff opened an account

with BANA/FIA in October 2003 and that CACH purchased this account (ending in account number 5522) pursuant to the Loan Sale Agreement and Bill of Sale.  Livits Decl. ¶¶ 7, 9, 11. Plaintiff's Complaint also refers to the BANA account number ending in 5522.  Compl. ¶¶ 17, 23, 25, 37.  Livits additionally states that the Credit Card Agreement pertaining to this account was provided to CACH following a specific request and that Exhibit 2 to her Declaration is a copy of said agreement, which was sent to Plaintiff.  Id. ¶ 12.  The Agreement has a copyright date of 2003, which is consistent with the date the account was opened.  Livits Decl., Ex. 2.

Under these circumstances, Plaintiff's claim that an agreement has not been produced is unavailing.  Livits' Declaration provides that Exhibit 2 is the written agreement pertaining to Plaintiff's account and this agreement includes the arbitration clause at issue.  Accordingly, the requirement that the agreement be in writing is satisfied.

### 2. Unambiguous Intent to Submit to Arbitration

Under Hawaii law, "[t]here must be a mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract." Douglass, 135 P.3d at 140 (alteration in original) (quoting Earl M. Jorgensen Co. v. Mark Construction, Inc., 540 P.2d 978, 982 (Haw. 1975)).  An

objective standard is applied to determine whether mutual assent or intent exists.  Id.

Here, on its face, the Agreement is clear that the parties shall be bound to arbitrate claims if either party so elects.  See Brown v. KFC Nat'l Mgmt. Co., 921 P.2d 146, 159 (Haw. 1996).  As provided in the Agreement in capital letters,

> YOU UNDERSTAND AND AGREE THAT IF EITHER YOU OR WE ELECT TO ARBITRATE A CLAIM, THIS ARBITRATION SECTION PRECLUDES YOU AND US FROM HAVING A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH COURT, OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS.  EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST BE RESOLVED THROUGH ARBITRATION IF YOU OR WE ELECT TO ARBITRATE.

Livits Decl., Ex. 2 § 7.19.  Thus, Plaintiff's contention that there is no "competent evidence" as to what terms she agreed to with respect to the Agreement is unavailing.  See Pl.'s Opp'n, at 10.

Plaintiff also notes that the Agreement is not signed and argues that there is no evidence that she entered into the Agreement.  Pl.'s Opp'n, at 11.  Hawaii courts have not had the opportunity to consider indications of mutual assent with respect to arbitration provisions in credit card agreements.  However, the Hawaii Supreme Court has previously noted that "while it is true that . . . the FAA 'requires that an agreement to arbitrate be in writing . . ., it does not require that the writing be signed by the parties.'"  Brown, 921 P.2d at 159 n.

22

16 (second alteration in original) (internal quotation marks omitted) (quoting Nghiem v. NEC Elec., Inc., 25 F.3d 1437, 1439 (9th Cir. 1994)).  Hawaii's Intermediate Court of Appeals has also recognized that assent to be bound to a contract can be gleaned from the conduct of the parties even where the contract is not signed.  See Credit Assocs. of Maui, Ltd. v. Carlbom, 50 P.3d 431, 437 (Haw. Ct. App. 2002) (noting that where a statute or agreement does not require it to be signed, "parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated" (quoting 17A Am. Jur. 2d Contracts § 185, at 195-96 (1991))); see also Capital One Bank (USA), N.A. v. Huffman, No. CAAP-13-0003149, 2014 WL 6488771, at *4 (Haw. Ct. App. Nov. 18, 2014) (holding that a signed credit card agreement was not necessary to maintain an action for assumpsit where the account holder previously made timely payments and made credit card purchases without disputing outstanding balances).

        Federal courts considering the issue have determined that a credit card agreement need not be signed to demonstrate that the holder of the card is bound by its terms.  These courts have reasoned that use of the credit cards indicates an intent to be bound by the terms of the credit card agreement, including provisions to arbitrate within the agreement.  See, e.g., Stinger v. Chase Bank, USA, NA, 265 F. App'x 224, 227 (5th Cir.

2008) (holding that by using the credit cards at issue,
plaintiff "demonstrated an intent to be bound by the terms of
the [cardmember agreements] and thus agreed to the arbitration
provisions in the [cardmember agreements])"; Cage v. Cach, LLC,
No. C13-01741RSL, 2014 WL 2170431, at *3 (W.D. Wash. May 22,
2014) (holding defendants could invoke arbitration clause of
credit card agreement although they were not signed where
plaintiffs did not dispute their use of the credit cards); Brown
v. Federated Capital Corp., 991 F. Supp. 2d 857, 861 (S.D. Tex.
2014) ("In the context of a credit card, a party is bound by the
terms of a credit card agreement if the party uses the credit
card, even if the party does not sign the credit card agreement
and even if the credit card agreement is not delivered to the
party.").

Here, Plaintiff does not dispute Defendants' claims
that she applied for the credit card at issue and used the
credit card.  See, e.g., Pl.'s Opp'n, at 11 ("The terms of
exactly what, if anything, Ms. Snyder agreed to when she applied
for the credit card are unknown.").  In addition, the Agreement
provides that it "becomes effective and you agree to its terms
by either using your Account or by not closing your Account
within 3 days of receipt of this Agreement."  Livits Decl., Ex.
2 § 1.1; see also Stinger, 265 Fed. Appx. at 227 (noting the
credit card agreements at issue "provided they would become

effective upon use of the cards" in supporting a finding that plaintiff's use of the credit card reflected an intent to be bound by the terms of the agreements).   The Affidavit of Sale and Certification of Debt signed by a BANA representative also provides that Plaintiff opened the account with BANA and used or authorized the use of the account "for the acquisition of goods, services, or cash advances in accordance with the customer agreement . . . governing use of the Account."  Mot. to Compel Arbitration, Ex. A ¶ 4.   Accordingly, because Plaintiff does not dispute her use of the credit card, the Court finds there was mutual assent to arbitrate despite the lack of a signature on the Agreement.[10]

---

[10]    The Court is aware that in Douglass, which is not discussed by the parties, the Hawaii Supreme Court considered whether there was an unambiguous intent to submit to arbitration based on an arbitration provision contained in an Employee Handbook.  135 P.3d at 531.  The court determined that although the employee signed the acknowledgement form verifying receipt of the 60 page Handbook, he did not unambiguously assent to arbitration because, inter alia, the acknowledgement form did not refer to the arbitration provision and there was no evidence that the employee was otherwise informed of the arbitration provision.  Id. at 531-34.  Importantly, the court pointed out that language immediately preceding the acknowledgement form provided that the policies within the Handbook "ARE NOT INTENDED TO AND DO NOT CREATE A CONTRACT BETWEEN YOU AND THE COMPANY" and the acknowledgment section stated, "**The provisions contained in this handbook are presented as a matter of information only and do not constitute an employment contract**."  Id. at 532.

Here, in contrast, the Agreement states that it "governs [the] credit card account" and that it "becomes effective and you agree to its terms by either using your Account or by not closing your Account within 3 days of receipt

(continued . . . )

Finally, Plaintiff claims that there is "no reliable evidence" that the Agreement was sent to her.  Pl.'s Opp'n, at 11.  However, Livits' Declaration states that Exhibit 2 to her Declaration (i.e., the Agreement) was sent to Plaintiff.  Livits Decl. ¶ 12.  Plaintiff has not provided evidence to rebut this statement, and accordingly, Plaintiff's argument fails.[11]

### 3. Bilateral Consideration

The Hawaii Supreme Court "has held that mutual assent to arbitration provides bilateral consideration."  Williams, 2015 WL 4139227, at *5; see also Brown, 921 P.2d at 159-60

---

( . . . continued)
of this Agreement," clearly providing that the Agreement is binding.  Livits Decl., Ex. 2 § 1.1.  Moreover, Douglass and the cases it relied on pertained to arbitration provisions in employee handbooks and similar documents provided to employees, and thus, is distinguishable.

[11]   Plaintiff has not argued that Defendants cannot compel arbitration because Defendants were not parties to the Agreement.  Nonetheless, the Court notes that the arbitration clause indicates that the right to arbitration extends to BANA's assigns.  See Livits Decl., Ex. 2, § 7.19 ("Any dispute, claim, or controversy by or between you and us (including each other's employees, agents or assigns) . . . shall, upon election by either you or us, be resolved by binding arbitration.").  Moreover, Defendants can enforce the arbitration clause because the claims against them "are encompassed by the Agreement," Davis, 2015 WL 913392, at *5 n.7, which provides that claims "arising out of or relating to this Agreement" will be subject to arbitration, Livits Decl., Ex. 2, § 7.19.  See Mohebbi v. Khazen, No. 13-CV-03044-BLF, 2014 WL 6845477, at *7 n.7 (N.D. Cal. Dec. 4, 2014) (holding defendant non-signatories could enforce arbitration clause where "the claims against those Defendants are encompassed by the express terms of the arbitration clause").

(noting that an agreement to arbitrate was supported by bilateral consideration where both parties to the agreement agreed to "forego their respective rights to a judicial forum").

Here, pursuant to the Agreement, the parties agreed that if arbitration was elected, claims arising out or relating to the Agreement "shall . . . be resolved by binding arbitration." Livits Decl., Ex. 2 § 7.19. The Agreement specifically notes, "YOU UNDERSTAND AND AGREE THAT" if either party elects arbitration, the arbitration provision "PRECLUDES" the parties from litigating claims in court. Id. Thus, it is clear that the parties to the Agreement agreed to arbitrate the claims at issue. Moreover, Plaintiff has failed to put forth any argument with respect to the issue of consideration. Accordingly, the Court finds this requirement satisfied.[12]

_____

[12] The Court notes that even if Arizona law were to be applied, the Court's conclusion regarding the validity of the agreement to arbitrate would not change. Under Arizona law, an arbitration agreement is enforceable where there exists "(1) an offer communicated to the offeree, (2) acceptance of the offer by the offeree, and (3) consideration." Taleb v. AutoNation USA Corp., No. CV06-02013-PHX-NVW, 2006 WL 3716922, at *2 (D. Ariz. Nov. 13, 2006). Plaintiff does not appear to dispute the existence of an offer or consideration, and the Court's preceding discussion demonstrates that these were both present in the instant case. To the extent Plaintiff disputes that there was acceptance, the above discussion regarding the mutual assent of the parties applies.

## C. Whether the Agreement Encompasses the Dispute at Issue

After determining the validity of the agreement, the Court must consider "whether the dispute is arbitrable, that is, whether it falls within the scope of the parties agreement to arbitrate." Chiron Corp., 207 F.3d at 1131.  "Interpretation of the scope of the arbitration clause is governed by the FAA." Williams, 2015 WL 4139227, at *6.  In determining whether a dispute is arbitrable, the Court "must be cognizant of the Act's federal policy favoring arbitration agreements." Chiron, 207 F.3d at 1131.  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Id. (quoting Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24–25 (1983)).  Moreover, the "factual allegations need only 'touch matters' covered by the contract containing the arbitration clause." Simula, 175 F.3d at 721.

Here, it is clear that the Agreement covers the dispute at issue.  The arbitration clause is "broad and far reaching," Chiron Corp., 207 F.3d at 1131, providing that "[a]ny dispute, claim or controversy . . . arising out of or relating to this Agreement, your Account, or the validity or scope of any provision of this Agreement . . . shall, upon election . . . be resolved by binding arbitration," Livits Decl., Ex. 2 § 7.19. Contrary to Plaintiff's contention, her claims arise out of or

28

relate to the Agreement and the account at issue.[13]   Plaintiff's FDCPA and state law claims involve allegations that Defendants sought to collect from her a debt higher than the amount actually owed under her account and that Defendants improperly calculated the amount of interest on the debt at a rate that was contrary to the original contract.   See, e.g., Compl. ¶¶ 65, 67-68, 104-06.   Thus, Plaintiff's claims involve debt collection activity related to the account at issue and the Agreement concerning the account.   Cf. Davis, 2015 WL 913392, at *6 (holding similar arbitration provision in credit card agreement encompassed FDCPA claim).

To the extent Plaintiff argues that because a federal question is implicated, arbitration should not be compelled, such an argument is unavailing.   See Pl.'s Opp'n, at 5. Plaintiff cites to no caselaw supporting this proposition and the Supreme Court has held that federal statutory claims may be subject to arbitration unless "Congress intended to preclude a waiver of a judicial forum."   Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991).

---

[13]   Plaintiff states that she "is not making any claim relating to the Agreement," but also notes that "[s]he is asserting that Defendants deceived her, mislead her, and attempted to collect interest and fees that were never owed under the Agreement."   Pl.'s Opp., at 5 (emphasis added).   In this respect, Plaintiff appears to concede that the claims at least "touch matters" related to the Agreement.

Plaintiff points to no evidence of Congress's intent to preclude the arbitration of claims under the FDCPA and many courts have found that FDCPA claims are arbitrable.  See, e.g., Davis, 2015 WL 913392, at *6 ("Myriad courts have analyzed the text and purpose of the FDCPA and found that FDCPA claims are arbitrable."); Brown v. Sklar-Markind, No. Civ. No. 14-0266, 2014 WL 5803135, at *12 (W.D. Pa. Nov. 7, 2014) ("[B]ecause the FDCPA is silent with regard to arbitration of claims brought under its auspices, the overwhelming majority of cases to consider the matter have . . . compelled arbitration of FDCPA claims finding such claims not categorically exempt from the FAA's reach."); Miller v. Nw. Tr. Servs., Inc., No. CV-05-5043-RHW, 2005 WL 1711131, at *4 n.4 (E.D. Wash. July 20, 2005) ("Neither the text of the FDCPA, its legislative history, nor an examination of the FDCPA's underlying purpose reveals any indication that Congress intended to preclude FDCPA claimants from resolving their disputes in arbitration.").  The Court finds no reason to stray from these decisions.

**D. Defenses**

The Court next considers and rejects the defenses to the enforceability of the Agreement raised by Plaintiff.

i.  Settlement Agreement

Plaintiff claims that Defendants should be barred from enforcing the agreement to arbitrate based on BANA's settlement

of a class action lawsuit in Ross et al. v. Bank of America,
N.A. et al., Civ. No. 5-7116 (WHP) (S.D.N.Y. July 22, 2010) (the
"Ross Settlement" or the "Settlement Agreement").  Pl.'s Opp.,
at 8.  In the Ross Settlement, according to the exhibits
attached to Plaintiff's Opposition, BANA agreed not to enforce
"an Arbitration Clause . . . against a member of the Settlement
Class based on currently existing or pre-existing United States
Cardholder Agreements" as of December 11, 2009.  Pl.'s Opp'n,
Ex. 1, at 7, 10.  The Settlement Agreement applied to "All
Persons holding during [the period from the first Bank
Defendant's adoption of an Arbitration Clause in its consumer
Credit Card agreement through the date of execution of the
settlement agreement] a Credit Card under a United States
Cardholder Agreement."  Id. at 8, Ex. 2, at 2.

Plaintiff maintains that she is a member of the
settlement class.  She further argues that because BANA sent a
statement to Plaintiff with a due date of November 23, 2009,
Defendants' "assertion" that BANA sold the account prior to
November 23, 2009 "appear[s] inaccurate" as "[it] makes no sense
that BANA would sale [sic] an account prior to the due date it
had afforded to the account holder."  Pl.'s Opp., at 8-9.
Although Plaintiff does not clearly explain the relevance of
this argument, it appears Plaintiff means to imply that the Ross

Settlement, which became effective on December 11, 2009, is applicable to her because BANA owned her account on that date.

However, as Defendants point out, there is nothing in the record to demonstrate that Plaintiff's account could not have been sold prior to the statement due date.  Defendants' Reply, at 7.  To the contrary, the unrebutted documents submitted to the Court by Defendants provide that Plaintiff's Account was sold to CACH—at the latest—on November 19, 2009.[14] Because BANA/FIA no longer owned the account on the date the relevant portion of the Settlement Agreement became effective, Plaintiff has failed to demonstrate that the settlement agreement applies to bar Defendants' rights to arbitration.

Although not raised by the parties, the Court notes that Section 13(b) of the Settlement Agreement provides that for accounts Bank of America transferred to a third party after February 1, 2010, Bank of America would contract with the third party "for said third party to abide" by Bank of America's commitment not to enforce pre-existing arbitration clauses. Pl.'s Opp'n, Ex. 1, at 10, 23.  This section of the agreement

---

[14]     The Court notes that the Loan Sale Agreement had an effective date of November 12, 2009.  Livits Decl. ¶ 11, Ex. 1. The Affidavit of Sale and Certification of Debt signed by a BANA representative provides that the sale date was November 17, 2009.  Mot. to Compel Arbitration, Ex. A ¶ 6.  The Bill of Sale, however, was executed on November 19, 2009.  ECF. No. 11-3.

does not apply to Plaintiff, however, as her Account was sold prior to February 1, 2010.

The Court additionally notes that the Settlement Agreement states that many of Bank of America's obligations under the agreement, including its commitment not to enforce pre-existing arbitration clauses, expire five "years after the date of execution" of the agreement.  See id. at 24.  The Settlement Agreement was executed in February 2010 and the Motion to Compel Arbitration was filed in May 2016.  Thus, even if the Settlement Agreement applied to Plaintiff, it appears that any relevant obligations under the agreement have expired.

ii.  Other Claims of Waiver and Estoppel

Plaintiff raises several additional claims that Defendants waived their right to arbitration or should be estopped from arbitration.

"'Waiver of a contractual right to arbitration is not favored,' and, therefore, 'any party arguing waiver of arbitration bears a heavy burden of proof.'"  Richards v. Ernst & Young, LLP, 744 F.3d 1072, 1074 (9th Cir. 2013) (quoting Fisher v. A.G. Becker Paribas Inc., 791 F.2d 691, 694 (9th Cir. 1986)); see also Fireman's Fund Ins. Co. v. AIG Hawai'i Ins. Co., 126 P.3d 386, 397 (Haw. 2006) ("[W]aiver of the right to arbitration pursuant to a valid arbitration agreement will not be lightly inferred." (citation omitted)).  To demonstrate

waiver, the party must show "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." Richards, 744 F.3d at 1074; see also Fireman's Fund Ins. Co., 126 P.3d at 397 (noting that an arbitration agreement "may be waived by the actions of a party which are completely inconsistent with any reliance thereon" (citation omitted)).

        First, Plaintiff argues that Defendants waived or are estopped from arbitration based on the filing of their Counterclaim. Pl.'s Opp'n, at 7. However, Plaintiff has not shown that the filing of the Counterclaim was inconsistent with Defendants' request for arbitration. To the contrary, Defendants state that their Counterclaim should also be resolved through arbitration. See Defs.' Opp'n to Pl.'s Mot. to Dismiss Counterclaim ("Defs.' Opp'n"), at 3, ECF No. 38. Moreover, Defendants have maintained throughout the litigation—including in their Answer—that they are entitled to arbitration in the instant case. See Answer, ¶ 138. And, the Motion to Compel Arbitration was filed two weeks after the filing of Defendants' Answer and Counterclaim. Finally, even assuming Plaintiff demonstrated inconsistent conduct, Plaintiff has not claimed any prejudice; and given that Defendants moved to compel arbitration

early on in the litigation, the Court finds there has been no prejudice to Plaintiff.

Under these circumstances, Plaintiff has failed to meet her heavy burden of demonstrating that the filing of Defendants' Counterclaim resulted in a waiver of Defendants' right to seek arbitration in the instant case.  Cf. Davis, 2015 WL 913392, at *7 (determining defendants did not waive their right to compel arbitration of FDCPA claim by suing in state court to collect debt owed by Plaintiff);  Hodson v. Javitch, Block & Rathbone, LLP, 531 F. Supp. 2d 827, 831 (N.D. Ohio 2008) (holding the filing of state court collections actions did not result in a waiver of the right to seek arbitration of FDCPA claims later brought by debtor).

Plaintiff additionally claims that Defendants "engaged in conduct constituting an undue delay" by filing the Motion to Compel Arbitration "while citing to inapplicable state statutes and caselaw."  Pl.'s Opp'n, at 13.  However, Defendants' citation to Arizona law was based on the choice-of-law clause in the Agreement.  In addition, as noted above, Defendants promptly moved for arbitration of Plaintiff's claims.  Accordingly, Defendants have not caused undue delay.

Finally, Plaintiff states that Defendants acted in contradiction to the obligations under the contract because they "added interest and fees to the account that were never owed."

35

Id.  Plaintiff does not, however, explain how this alleged
conduct is inconsistent with Defendants' right to arbitrate.
Additionally, as noted above, Plaintiff has not put forth any
claim of prejudice.

## II.  Plaintiff's Motion to Dismiss the Counterclaim

Defendants' Counterclaim seeks to collect on the
underlying debt.  Counterclaim ¶¶ 12-21.  Given the Court's
determination that Plaintiff's case is subject to arbitration,
the Court need not decide Plaintiff's Motion to Dismiss the
Counterclaim.  Defendants maintain that their Counterclaim is
subject to arbitration, and accordingly, seek to have their
Counterclaim arbitrated.  See Defs.' Opp'n, at 3.

Pursuant to the Court's above discussion, there is a
valid arbitration agreement and Plaintiff has not put forth a
viable defense to the arbitration.  Moreover, as with
Plaintiff's claims, the Counterclaim also "falls within the
scope of the parties agreement to arbitrate."  Chiron Corp., 207
F.3d at 1131.  Indeed, as discussed above, the Agreement's
arbitration provision encompasses claims arising out of or
related to the Agreement, and Defendant's Counterclaim seeking
to collect the underlying debt clearly falls within the
provision's broad language.

Thus, because the Counterclaim is subject to arbitration, the Court dismisses the Counterclaim along with Plaintiff's Complaint.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Compel Arbitration and Dismiss Claims, ECF No. 19, and DENIES Plaintiff's Motion to Dismiss Defendant's Counterclaim, ECF No. 21, as moot.  The Court dismisses the Complaint as well as the Counterclaim, as both must be submitted to arbitration.  The Clerk of Court is directed to close the case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 10, 2016.

Alan C. Kay
Sr. United States District Judge

Snyder v. CACH, LLC, and Mandarich Law Group, LLP, Civ. No. 16-00097 ACK-KJM Order Granting Defendants' Motion to Compel Arbitration and Dismiss Claims, Dismissing Defendants' Counterclaim, and Denying Plaintiff's Motion to Dismiss for Lack of Jurisdiction Defendants' Counterclaim as Moot.